IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **VANAJA MANNE**, | * | |
| Plaintiff, | * | |
| v. | * | Civil No. **21-1092 PJM** |
| **UR M. JADDOU**, | * | |
| Defendant. | * | |

* * * * * * *

| | | |
|---|---|---|
| **KOSTA GARA** *et al.*, | * | |
| Plaintiff, | * | |
| v. | * | Civil No. **21-1947 PJM** |
| **UR M. JADDOU** *et al.*, | * | |
| Defendants. | * | |

* * * * * * *

| | | |
|---|---|---|
| **LUIS SINIBALDI** *et al.*, | * | |
| Plaintiff, | * | |
| v. | * | Civil No. **21-2225 PJM** |
| **UR M. JADDOU** *et al.*, | * | |
| Defendants. | * | |

**MEMORANDUM OPINION**

These cases concern the processing and adjudication of various immigrant applications and petitions. Plaintiffs, three individuals and one corporation, bring these actions against Defendant Ur M. Jaddou, Director of United States Citizenship and Immigration Services

("USCIS"), among others.[1]  Plaintiffs seek court orders compelling USCIS to act favorably on their visa applications, invoking the Administrative Procedures Act ("APA").

Defendants have moved to transfer all three cases from the District of Maryland to the federal judicial districts covering the USCIS field offices, district offices, or regional offices in which Plaintiffs' visa applications are currently pending, being processed, or have already been processed.  Plaintiffs, all residents of states other than Maryland, oppose transfer.  For the reasons that follow, the Court finds that venue is more appropriate in the other federal judicial districts.  Accordingly, the Court **GRANTS** Defendants' Motion to Transfer.

I.

Under United States immigration law, foreign nationals wishing to live, work, or study in the United States typically must first obtain visas through an application process.  *Requirements for Immigrant and Nonimmigrant Visas*, U.S. Customs and Border Protection (Jan 3. 2018).  Congress, through the Immigration and Nationality Act ("INA"), grants the Executive Branch broad authority over immigration.  *See* 8 U.S.C. § 1101. The INA specifically charges the Secretary of Homeland Security with the administration and enforcement of immigration laws.  *Id.* § 1103(a)(1). The Secretary has delegated this authority to an agency within the Department of Homeland Security, the U.S. Citizenship and Immigration Services ("USCIS").  *See* 8 C.F.R. §§ 2.1, 100.1.  USCIS is the entity primarily responsible for processing visa applications, as well

---

[1] Plaintiff Manne brings suit against Jaddou only.  Plaintiffs Gara and Sinibaldi bring suit against Jaddou, Secretary of Homeland Security Alejandro Mayorkas, and USCIS.

as applications for other immigration benefits, including naturalization. *See id.* § 204.[2] The steps that USCIS must take to render a decision on an application depend on the type of application and may require fee collection, data entry, background checks, biometric checks, and in person interviews.[3] To process the millions of applications it receives annually, USCIS maintains resources in its 88 field offices, 16 district offices, and four regional offices, which are located throughout the country. U.S. Government Accountability Office, GAO-21-529, *Report to Congressional Requesters on U.S. Citizenship and Immigration Services: Actions Needed to Address Pending Caseload* (hereinafter, "GAO Report"), August 18, 2021, p. 8.

The road to obtaining a final decision on an application or petition can be long and winding. For some individuals, the application process can take months, if not years, to complete.[4] A recent GAO study found that USCIS's pending caseload grew an estimated 85% from Fiscal Year 2015 through Fiscal Year 2020. *Id.* at p. 1. Furthermore, factors such as

---

[2] "Each year, the Department of Homeland Security's (DHS) U.S. Citizenship and Immigration Services (USCIS) processes millions of applications and petitions for person seeking to visit the U.S. for study, work, or other temporary activities; reside in the U.S. on a permanent basis; or become U.S. citizens . . . USCIS is the federal agency charged with adjudicating applications and petitions for immigration benefits, such as humanitarian relief, adjustment to lawful permanent resident status, change or extension of nonimmigrant (i.e. temporary) status, naturalization, and employment authorization." . U.S. Government Accountability Office, GAO-21-529, *Report to Congressional Requesters on U.S. Citizenship and Immigration Services: Actions Needed to Address Pending Caseload* (hereinafter, "GAO Report"), August 18, 2021, p. 1.

[3] "In general, USCIS's case processing tasks include (1) receiving the application or petition, collecting associated fees, entering data in case management systems; (2) conducting background and biometric checks and assessing the complexity of the case; (3) assessing the relevant individual's eligibility, identifying potential fraud or national security concerns, and scheduling an interview (if applicable); (4) interviewing the individual (if applicable); and (5) updating case management systems and issuing notices, requests, decisions and certificates." GAO Report, p. 9.

[4] *See* Historical National Median Processing Time (in Months) for all USCIS Offices for Select Forms by Fiscal Year, USCIS, available at https://egov.uscis.gov/processing-times/historic-pt. In some cases, some individuals must file an initial application, then wait years to file applications for adjustment of immigrant status. *See also* Visa Bulletin For December 2021, U.S. Department of State, available at https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2022/visa-bulletin-for-december-2021.html.

competing priorities, increased length of forms, expanded interview requirements, staffing, and the COVID-19 pandemic have impacted USCIS's processing times. *Id.* at 15.

In addition to resource constraints, certain statutory provisions limit the number of visas that may be awarded by USCIS each year. For example, Congress has established by statute numerical limits for the number of permanent resident visas (known as "green cards") to be granted in a fiscal year in each of the family-based, employment-based, and diversity-based visa categories. *See* 8 U.S.C. § 1151. Congress has also established per-country limitations for visas: no more than 7% of the total number of family-based or employment-based visas may be made available to citizens of any one country in a single fiscal year. 8 U.S.C. § 1152(a)(2). Due to this per-country cap, citizens of countries with higher numbers of applicants can experience longer wait times for visas.

In December 2020, USCIS relocated its national headquarters from the District of Columbia to Camp Springs, Maryland, which is within this Court's jurisdiction. In the months following the relocation, this Court experienced an unprecedented increase in immigration case filings, particularly cases filed by plaintiffs alleging unreasonable delay in the adjudication of their visa applications, all of which sought court orders compelling USCIS to act on their applications.[5]

Given the large number of filings in this Court, USCIS filed an Omnibus Motion to Transfer Venue in which it sought transfer of over thirty cases from Maryland's federal district

---

[5] *See Chakrabarti v. United States Citizenship and Immigr. Servs.*, Civ No. 21-1945-PJM, 2021 WL 4458899, at *2, n.2 (D. Md. Sept. 29, 2021) ("To give an idea of the recent crush of filings, the United States Attorney's Office for the District of Maryland advises that monthly visa filings in this District increased from one filing in January 2021, to 16, 32, and 42, in April, May, and June of this year, respectively . . . As of this writing, some 150 visa cases are pending in this District, all of which were filed after May 1, 2021, the great majority of which have been filed by non-resident petitioners.") (internal citations omitted).

court to other federal judicial districts. Specifically, USCIS has asked the Court to transfer each case to the federal district court where the plaintiff resides or the federal district court covering the office where the plaintiff's petition or application is pending or being processed. Omnibus Mot. to Transfer ("Mot.")[6] at 2. USCIS emphasizes that Plaintiffs in each of the present cases resides outside of Maryland and that the administrative records related to Plaintiffs' applications are located in service centers and field offices outside of Maryland. *Id.* Indeed, following the filing of the present Motion, eighteen cases have been voluntarily transferred, eight cases have been voluntarily dismissed, and one has been dismissed as moot.[7] However, Plaintiffs in three cases before the Court have opposed transfer.

Plaintiffs in these three cases urge the Court to keep their cases in the District of Maryland for various reasons, primarily because venue is proper in this district and because this is the venue they have chosen. *See* Manne Resp. in Opp'n to Mot. to Transfer, No. 21-cv-1092-PJM (formerly No. 21-cv-1092-CBD), ECF No. 29 ("Manne Opp'n"); Gara Resp. in Opp'n to Mot. to Transfer, No. 21-cv-1947-PJM (formerly No. 21-cv-1947-TDC), ECF No. 10 ("Gara Opp'n"); Sinibaldi Resp. in Opp'n to Mot. to Transfer, No. 21-cv-2225-PJM (formerly No. 21-cv-2225-TJS), ECF No. 8 ("Sinibaldi Opp'n"). They adduce a number of arguments why transfer to other districts would be inconvenient, suggesting that transfer would inure only to the benefit of the Government. *See* Gara Opp'n at 10. Further, they oppose the omnibus nature of the Motion. *Id.* at 11. Defendants argue that their Omnibus Motion is proper because each of

---

[6] The Omnibus Motion was filed in the three of the cases that remain pending: No. 21-cv-1092-PJM (formerly No. 21-cv-1092-CBD), ECF No. 25; No. 21-cv-1947-PJM (formerly No. 21-cv-1947-TDC), ECF No. 8; No. 21-cv-2225-PJM (formerly No. 21-cv-2225-TJS), ECF No. 7).

[7] There is one other outstanding case, *Lagos-Aguilera, et al. v. Mayorkas, et al.*, No. 21-cv-1899-JKB. In *Lagos-Aguilera*, the parties are attempting to resolve the issues in the litigation; accordingly, briefing in that case has been stayed.

5

the cases at issue shares certain commonalities favoring transfer. Omnibus Reply to Resps. to Mot. to Transfer ("Reply")[8] at 4.

Most importantly, the agency actions challenged here are complex and involve a number of moving parts. For this reason, the Court is persuaded that venue more properly lies in the federal judicial districts where USCIS employees structurally organized to adjudicate Plaintiffs' applications are located, primarily because the administrative records pertinent to those applications are already in those districts. The Court considers the individual circumstances of the Plaintiffs in each of these three cases.

### A. *Manne v. Jaddou*

Plaintiff Vanaja Manne is an Indian national who resides in Robbinsville, New Jersey. No. 21-cv-1092-PJM (formerly No. 21-cv-1092-CBD), Compl., ECF No. 1, ¶ 1 ("Manne Compl."). Manne brought suit against Tracy Renaud, then Acting Director of USCIS, alleging that USCIS has unreasonably delayed the adjudication of her various applications and petitions. *Id.* ¶¶ 2, 54–116. She asks the Court to declare all delays described in her Complaint as unreasonable and would have the Court order USCIS to act on her applications within 14 days. *Id.* ¶¶ 121–128.

In January 2007, Manne's now-husband, Sharath Chandra Tripuraneni, began working for a U.S. employer under two different types of work authorization, first under an F-1 student

---

[8] The Omnibus Reply to Plaintiffs' Responses in Opposition to the Motion to Transfer was filed in all three of the cases that remain pending: No. 21-cv-1092-PJM (formerly No. 21-cv-1092-CBD), ECF No. 30; No. 21-cv-1947-PJM (formerly No. 21-cv-1947-TDC), ECF No. 11; No. 21-cv-2225-PJM (formerly No. 21-cv-2225-TJS), ECF No. 11).

visa,[9] then under an H1-B visa.[10]  *Id.* ¶ 40.   In 2012, Tripuraneni's employer began the permanent labor certification process for him, a process which allows employers to hire foreign workers on a permanent basis.  *Id.* ¶ 43.  In 2015, Tripuraneni and Manne married, and Manne joined Tripuraneni in the United States through H-4 dependent status.[11]  *Id.* ¶ 41.

Manne and Tripuraneni hope to obtain lawful permanent resident status ("green cards") through petitions for adjustment of status (Form I-485s).  The fact that Tripuraneni's employer sponsored him in 2012 made both Tripuraneni and Manne eligible to apply for such status.  However, due to the statutory per-country limitations on visas, Tripuraneni and Manne faced a years-long wait before filing their petitions in October 2020.[12]  *Id.* ¶¶ 43-44, 47.

---

[9] An F-1 visa allows an individual "to enter the United States as a full-time student at an accredited college, university, seminary, conservatory, academic high school, elementary school, or other academic institution or in a language training program" "that culminates in a degree, diploma, or certificate." *Students and Employment*, USCIS, available at: https://www.uscis.gov/working-in-the-united-states/students-and-exchange-visitors/students-and-employment.

[10] Under the H1-B classification, foreign nationals who are professional workers to fill positions in the United States in specialty occupations, services of exceptional merit and ability relating to a Department of Defense (DOD) cooperative research and development project, or services as a fashion model of distinguished merit or ability.  *H-1B Specialty Occupations, DOD Cooperative Research and Development Project Workers, and Fashion Models*, USCIS, available at: https://www.uscis.gov/working-in-the-united-states/h-1b-specialty-occupations.

[11] H-4 status is a status available to the spouse and children dependents of individuals granted H1-B status.  *Employment Authorization for Certain H-4 Dependent Spouses*, USCIS, available at: https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-1b-specialty-occupations-and-fashion-models/employment-authorization-for-certain-h-4-dependent-spouses.

[12] Each month, the Department of State issues a Visa Bulletin summarizing the availability of visa numbers.  *See, e.g.*, *Visa Bulletin For November 2021*, U.S. Department of State – Bureau of Consular Affairs, available at: https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2022/visa-bulletin-for-november-2021.html.  Certain countries—China, India, Mexico, and the Philippines—have a high number of individuals seeking U.S. visas.  Because of the per-country statutory cap, each Visa Bulletin indicates when certain individuals can apply for visas based on their "priority dates," which are determined by the filing date of other visa petitions.  *Id.  See also Visa Availability and Priority Dates*, USCIS, available at: https://www.uscis.gov/green-card/green-card-processes-and-procedures/visa-availability-and-priority-dates.

Manne asserts that her H-4 status was slated to expire on April 30, 2021, which is why in December 2020 she filed petitions with USCIS seeking employment authorization under H-4 status. *Id.* ¶¶ 47-48. She asserts that she has provided USCIS with all necessary information to adjudicate her status but that USCIS has yet to act on any of her applications. *Id.* ¶¶ 52-53. At present, Manne remains lawfully present in the United States even though she has applications pending. *Id.* ¶ 49.

B.  *Gara, et al. v. Jaddou, et al.*

Plaintiff Kosta Gara is a foreign national who resides in Miami, Florida. No. 21-cv-1947-PJM (formerly No. 21-cv-1947-TDC), Compl., ECF No. 1, ¶¶ 6, ("Gara Compl."). Gara brings suit against Alejandro Mayorkas, Secretary of the U.S. Department of Homeland Security; Ur M. Jaddou, Director of USCIS; and USCIS. *Id.* ¶¶ 7–9. After Gara applied for lawful permanent resident status on two distinct bases, USCIS denied his second petition apparently because he already had a petition pending. *Id.* ¶ 28. He submits that this denial was arbitrary and capricious and that USCIS acted contrary to several provisions of the APA. *Id.* ¶¶ 43–56. He further alleges that the denial was ultra vires in violation of the agency's responsibilities under the Immigration and Nationality Act. *Id.* ¶¶ 57–59. Gara asks the Court to declare the denial of his Form I-485 as "erroneous as a matter of law," "arbitrary and capricious," and "otherwise violative of due process. *Id.* at 20. He asks the Court to issue an order indicating that he has met all requirements for an adjustment of status to lawful permanent residence and would have the Court direct Defendants to withdraw the denial of his I-485 and issue a green card. *Id.* at 20–21.

On June 13, 2013, Gara received conditional permanent resident status through the EB-5 investor program.[13]  *Id.* ¶ 19.  Because he applied under the EB-5 category, Gara was subject to a two-year conditional permanent residence period.  Toward the end of that period, on July 11, 2015, Gara filed an I-829 petition to remove the conditions on his permanent resident status.  *Id.*  Gara alleges that he did not hear from USCIS regarding his I-829 petition until August 30, 2018, nearly three years later.  *Id.*

On September 14, 2018, Gara married a United States citizen. *Id.* ¶ 20.  Because he had not heard from USCIS regarding his petition to remove conditions, on November 30, 2018, he applied for permanent resident status based on his marriage.  *Id.* ¶ 22.  Following the submission of that application, USCIS interviewed Gara and his wife in September of 2019.  *Id.* ¶ 23.  According to Gara, during that interview a USCIS officer informed him that he would be issued a new green card based on his marriage.  *Id.*  Based on this representation, Gara withdrew his pending I-829 based on his EB-5 conditional residency status in early 2020.  *Id.*

However, on October 29, 2020, Gara allegedly received a notice from USCIS, informing him that his application was denied because, at the time of application, he had already been admitted as a lawful permanent resident and was thus ineligible to adjust status.  *Id.* ¶ 28.  He continues to seek adjustment of his status.

C.  *Sinibaldi, et al. v. Jaddou, et al.*

Plaintiff The People Company is an Alabama corporation that provides companies with "outsourcing, staffing, and facility management services."  Plaintiff Luis Sinibaldi is the

---

[13] Under the EB-5 Program, investors (and their dependents) are eligible to apply for permanent residence if they (1) make the necessary investment in a commercial enterprise in the United States; and (2) plan to create or preserve 10 permanent full-time jobs for qualified U.S. workers. *EB-5 Immigrant Investor Program*, USCIS, https://www.uscis.gov/working-in-the-united-states/permanent-workers/eb-5-immigrant-investor-program.

company's Operations Director. No. 21-cv-2225-PJM (formerly No. 21-cv-2225-TJS), Compl., ECF No. 1, ¶ 1 ("Sinibaldi Compl."). The People Company filed an I-129 petition[14] on behalf of Sinibaldi so that Sinibaldi could obtain L-1A status, which allows certain nonimmigrant foreign workers to work in the United States in a managerial or executive capacity on a temporary basis.[15] Id. ¶ 2. USCIS denied the petition. ¶ 5. The People Company and Sinibaldi sue Mayorkas, Jaddou, and USCIS, alleging the same five counts as Gara. Id. ¶¶ 8–10, 63–79. They ask the Court to declare all delays described in their Complaint as unreasonable and to order USCIS to immediately approve Sinibaldi's I-129 and withdraw its prior denial. Id. ¶¶ 121–128.

The People Company, formed in 2017, is a subsidiary of a Guatemala-based company. Id. ¶ 17. In order to serve as the CEO of the company, Sinibaldi filed an application for L-1A status, which was approved on June 22, 2018. Id. ¶ 18. After his initial status expired on June 21, 2019, Sinibaldi applied for an extension of status. Id. The People Company also filed another Form I-129 petition on his behalf. Id. ¶¶ 26–27. USCIS, however, issued a denial notice, concluding that The People Company had provided a "vague duty description" insufficient to establish that Sinibaldi qualifies as a Multinational Manager or Executive as required for L-1A status. Id. ¶ 28. According to Plaintiffs, in reaching this conclusion, USCIS purportedly ignored extensive documentation submitted in support of the I-129 petition. Id. ¶¶

---

[14] Form I-129 is used by employers to file on behalf of a nonimmigrant worker to come to the United States temporarily to perform services or labor, or to receive training. Petitioners may also use this form to request an extension of stay or change of status. *I-129 Petition for a Nonimmigrant Worker*, USCIS, available at: https://www.uscis.gov/i-129.

[15] L-1A status is a nonimmigrant classification that enables a U.S. employer to transfer an executive or manager from an affiliated foreign office to an office within the U.S., or to send an executive or manager to the U.S. for the purpose to establishing a U.S. office. *L-1A Intracompany Transferee Executive or Manager*, USCIS, available at: https://www.uscis.gov/working-in-the-united-states/temporary-workers/l-1a-intracompany-transferee-executive-or-manager.

30, 32–37. Further, Plaintiffs assert that USCIS ignored evidence regarding The People Company's staffing levels. *Id.* ¶¶ 44–46.

After the I-129 was denied, the People Company filed a Form I-140[16] for Sinibaldi. *Id.* ¶ 48. It also filed a motion to reopen and reconsider USCIS's latest denial, submitting additional evidence in support of the petition. *Id.* ¶¶ 49–50. Plaintiffs state that their own motion contained a procedural error, which resulted in USCIS denying the motion. *Id.* ¶¶ 50–51.

On October 19, 2020, USCIS approved the Form I-140 petition for Sinibaldi. *Id.* ¶ 52. Nonetheless, because the L-1A extension had already been denied and because removal proceedings had already been conducted, Sinibaldi's adjustment of status was administratively closed. *Id.* Plaintiffs maintain that the People Company has now demonstrated that Sinibaldi meets the criteria set forth in the relevant regulations for the definition of an executive. *Id.* ¶ 54. Further, they claim that USCIS's previous approval of Sinibaldi's initial L-1A demonstrates that he meets the criteria for approval at this time. *Id.* ¶ 55.

## II.

A court may transfer a civil action to any other district "[f]or the convenience of the parties and witnesses, in the interest of justice," as long as the transferee district is one where the case "might have been brought." 28 U.S.C. § 1404(a). The moving party bears the burden to establish both (1) that the plaintiff could have brought the action in the proposed transferee court and (2) that the action should have been brought there. *See Kontoulas v. A.H. Robins Co.*, 745

---

[16] Form I-140 is used by employers to file on behalf of an alien worker to become a permanent resident of the United States. I-140, Immigrant Petition for Alien Workers, available at: https://www.uscis.gov/i-140.

11

F.2d 312 (4th Cir. 1984); *Lynch v. Vanderhoef Builders,* 237 F. Supp. 2d 615, 617 (D. Md. 2002).

The Court finds that Plaintiffs <u>could</u> have brought these cases in the judicial districts where the relevant USCIS service centers and field and regional offices handling their petitions are located, a proposition Defendants do not dispute. Suits against an officer or employer of the United States may "be brought in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred . . . or (C) the plaintiff resides if no real property is involved in this action." 28 U.S.C. § 1391(e)(1). The decisonmaking process for adjudicating Plaintiffs' visa applications occurs in USCIS service centers and field and regional offices, and any delay or improper denial—that is the "events or omissions" giving rise to their claims—occurred in the judicial districts covering those offices. Thus, Plaintiffs could have brought their claims in those judicial districts. *See Chakrabarti v. United States Citizenship & Immigr. Servs.*, No. CV 21-1945 PJM, 2021 WL 4458899 (D. Md. Sept. 29, 2021). *See also McAfee LLC v. United States Citizenship & Immigr. Servs.*, No. 19-CV-2981 (DLF), 2019 WL 6051559, at *1 (D.D.C. Nov. 15, 2019) (finding that plaintiff could have brought claim in district where USCIS service center was located); *Ike v. United States Citizenship & Immigr. Servs.*, No. 20-CV-1744 (CRC), 2020 WL 7360214, at *1 (D.D.C. Dec. 15, 2020) (same).

That said, the Court finds that plaintiffs <u>should</u> have brought their claims in these other judicial districts rather than in Maryland. In determining where venue is appropriate, the district court enjoys broad discretion to determine whether transfer is appropriate and considers: "1) the weight accorded the plaintiff's choice of venue; 2) witness convenience and access; 3) convenience of the parties, and 4) the interest of justice." *Trustees of the Plumbers and*

*Pipefitters Nat. Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 444 (4th Cir. 2015); *Dicken v. United States*, 862 F. Supp. 91, 92 (D. Md. 1994). While Plaintiffs argue, rightly, that this analysis requires the examination of individualized factors, the Court is persuaded that the commonality of certain factors in each Plaintiff's case—especially given that each Plaintiff resides outside of Maryland and that each currently has an application or petition involving issues raised before this Court pending, being processed, or already processed outside of Maryland—makes consideration of the varying venue factors appropriate. The Court, then, considers the four factors relevant to possible transfer of the cases, with the understanding that the burden is on Defendants to justify transfer in each case.

### 1. The Weight Accorded to Plaintiffs' Choice of Venue

A plaintiff's choice of forum is typically afforded deference. *See Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 265–66 (1981); *United States ex rel. Salomon v. Wolff*, 268 F. Supp. 3d 770, 774 (D. Md. 2017). However, in cases in which "none of the conduct complained of occurred in the forum selected by the plaintiff and said forum has no connection with the matter in controversy," deference is less appropriate. 268 F. Supp. 3d at 774–75 (citing *Dicken*, 862 F. Supp. at 92–93) (internal citations omitted). In particular, when a plaintiff chooses to bring suit in a forum that is not plaintiff's home forum, deference is less likely. 268 F. Supp.3d at 775; *see also Lynch*, 237 F. Supp. 2d at 617 (citing *Dicken*, 862 F. Supp. at 92–93).

Plaintiffs in all three cases before the Court reside outside of Maryland. But Plaintiffs submit that they are challenging agency decisions based on broader USCIS policies. Gara Opp'n at 9; Sinibaldi Opp'n at 5. The Court is unpersuaded. Merely alleging that broad USCIS policy might impact the decisionmaking of USCIS officers in various service centers and field offices around the country is insufficient to anchor venue in Maryland. *See, e.g., Montgomery v. Barr*,

13

502 F. Supp. 3d 165, 177–78 (D.D.C. 2020) (transferring case even though plaintiff cited national policy and named high level government officials as defendants because plaintiff's claims did "not truly focus on a national policy"). *See also Pasem v. United States Citizenship & Immigr. Servs.*, No. 20-cv-334 (CRC), 2020 WL 2514749, at *4 (D.D.C. May 15, 2020) ("Although the policy affects every plaintiff, it does so in different ways, and the evidence of how it has affected each plaintiff is best available at the service center where they submitted their applications."). The fact remains that Plaintiffs raise claims relating to their particular circumstances and ask for individualized relief. Therefore, insofar as Plaintiffs attempt to justify venue in Maryland based on broader USCIS policy, their argument is unconvincing.

### 2. Witness Convenience and Access

Convenience of the witnesses is "perhaps the most important factor to consider when analyzing a § 1404(a) motion to transfer venue." *Salomon*, 268 F. Supp. 3d 775 (D. Md. 2017) (citing *Ralph v. Long*, No. CIV.A. DKC993281, 2001 WL 706034, at *3 (D. Md. June 14, 2001)). Generally, when a defendant has shown that most of its key witnesses are residents of another district, motions to transfer are granted. 268 F. Supp.3d 770. In a case involving review of an agency action, 'the location of witnesses is not a significant factor,' but 'the location of the administrative record . . . carries some weight.'" *Melnattur v. United States Citizenship & Immigr. Servs.*, No. CV 20-3013 (JDB), 2021 WL 3722732, at *7 (D.D.C. Aug. 23, 2021) (citing *Aftab v. Gonzalez*, 597 F. Supp. 2d 76, 83 (D.D.C. 2009). *See also Wolfram Alpha LLC v. Cuccinelli*, 490 F. Supp. 3d. 324, 333 (D.D.C. 2020).

In all three of the cases before the Court, relevant administrative records are already located in service centers or field offices outside of Maryland. While witness testimony is not ordinarily relevant in matters arising under the APA, the fact remains that USCIS personnel who

14

would be most aware of the contents and status of a particular plaintiff's application are located at various USCIS service centers and field offices around the country, not at USCIS headquarters in Maryland. *See Melnattur*, 2021 WL 3722732 at *7; *Pasem*, 2020 WL 2514749, at *4; *Akinyode v. United States Dep't of Homeland Sec.*, No. CV 21-110 (JDB), 2021 WL 3021440, at *4 (D.D.C. July 16, 2021).

Plaintiffs Manne and Gara submit that this factor actually weighs in favor of keeping their cases in Maryland because the location of a visa applicant's administrative record might change as USCIS processes the application. Manne Opp'n at 11; Gara Opp'n at 10. While this hypothetical situation is not impossible, the Court still fails to see how venue would be more appropriate in Maryland, given that the administrative record and witnesses are currently located in other federal judicial districts, and for all intents and purposes, would appear to remain there. Perhaps if Defendants were to seek transfer of a given case where the processing locations had changed multiple times, the venue factors, at that juncture, might weigh against transfer. But given the present posture of the cases, the Court is not persuaded that this theoretical possibility makes venue more appropriate in Maryland. Witness convenience and access, therefore, weigh heavily in favor of transfer.

### 3. Convenience of the Parties

The convenience of the parties factor is "chiefly operative" in cases where a plaintiff has chosen a forum away from either party's home. *Dicken*, 862 F. Supp. at 93 (quoting *Bd. of Trustees, Sheet Metal Workers Nat. Fund v. Baylor Heating & Air Conditioning, Inc.*, 702 F. Supp. 1253, 1259 (E.D. Va. 1988)). Plaintiffs submit that transfer would be inconvenient, in part because they would have to hire local counsel and/or pay *pro hac vice* fees in other courts. Gara Opp'n at 10; Sinibaldi Opp'n at 6. No doubt it would be more convenient for Plaintiffs'

15

counsel to keep all the cases here.  As Defendants correctly argue, however, the location of counsel is not really a factor that even enters into the equation, much less does it tilt the argument as to transfer in Plaintiffs' favor.  *See Armanno v. Puricle Inc.*, No. CV WDQ-05-2904, 2006 WL 8456736, at *3 (D. Md. June 1, 2006) (internal citations omitted) ("The location of counsel, however, is not a factor to be assessed in determining whether to transfer a case under § 1404(a) . . . and [plaintiff], as a Florida resident, will be forced to travel a significant distance regardless of whether venue is transferred.").

In any event, the question of convenience of the parties, both plaintiffs and defendants, is always one of the relative convenience of the parties. *Dicken*, 862 F. Supp. at 93 (citing *Bd. of Trustees, Sheet Metal Workers Nat. Fund*, 702 F. Supp. at 1259).  Once again, the individualized determinations necessary in each of the cases before the Court can be more conveniently made where the applications are already pending, are being processed, or have been processed.  Thus, the relative convenience of the parties also favors transfer.

### 4.  Interest of Justice

The "interest of justice" factor is broad for venue purposes, encompassing all the factors beyond Plaintiffs' preferred forum and the convenience of witnesses and parties, allowing the court to take into account a number of considerations. *See Brock v. Entre Computer Centers, Inc.*, 933 F.2d 1253, 1258 (4th Cir. 1991); *see also D2L Ltd. v. Blackboard. Inc.*, 671 F. Supp. 2d 768, 783 (D. Md. 2009).  Once again, Plaintiffs come up short.  When Plaintiffs speak of the interests of justice, they largely repeat their arguments that since USCIS policy emanates from headquarters, their cases belong here.  Gara Opp'n at 12; Sinibaldi Opp'n at 7.

As discussed in *Chakrabarti v. United States Citizenship and Immigration Services*, courts routinely grant motions to transfer in cases like the one at hand where the only connection

16

to the district is the location of a federal agency's headquarters. 2021 WL 4458899, at *6 (citing *Aftab v. Gonzalez*, 597 F. Supp. 2d 76, 81 (D.D.C. 2009). *See also Melnattur v. United States Citizenship and Immigr. Servs.*, No. CV 20-3013 (JDB) 2021 WL 3722732 (D.D.C. Aug. 23, 2021) (transferring case to district where relevant USCIS field office was located); *Akinyode*, No. CV 21-110 (JDB), 2021 WL 3021440 (D.D.C. July 16, 2021) (same); *Pasem v. United States Citizenship & Immigr. Servs.*, No. 20-CV-344 (CRC), 2020 WL 2514749, at *2 (D.D.C. May 15, 2020) (same); *Chauhan v. Napolitano*, 746 F. Supp. 2d 99 (D.D.C. 2010) (same); *Al-Ahmed v. Chertoff*, 564 F. Supp. 2d 16 (D.D.C. 2008) (same). Even if venue is considered available in Maryland because USCIS headquarters are located here, decisions in the cases still more suitably turn on where adjudicating officers, sufficient in number and expertise, are located. Other than broad statements regarding agency policy, Plaintiffs have not identified any action or omission undertaken by an official located in Maryland.

Overall, the Court fails to see how the interests of justice militate in favor of venue continuing in Maryland. Visa applications and petitions are handled by multiple USCIS service centers and field and regional offices around the country. Thousands, if not millions, of petitions similar to those of Plaintiffs are currently in process or will always be in process there. If plaintiffs in all these cases were permitted to manufacture venue in Maryland simply because USCIS has moved its headquarters here, this District "could become deluged with immigration cases." *Melnattur*, at *8 (citing *Wolfram Alpha LLC v. Cuccinelli*, 490 F. Supp. 3d 324 (D.D.C. 2020) (reasoning that the District Court for the District of Columbia could quickly become overwhelmed if all immigration cases were found to be properly brought there).

To be clear: the present Opinion addresses only Defendants' Motion to Transfer. In no sense does the Court intend to rule upon the merits of Plaintiffs' requests for relief.

The Court therefore concludes that on balance the interests at stake favor transferring these cases to the federal district courts where the USCIS service centers and field and regional offices are currently processing Plaintiffs' claims.

### III.

Accordingly, the Court **GRANTS** Defendants' Motion to Transfer, as follows:

Plaintiff Manne's case will be **TRANSFERRED** to the U.S. District Court for the District of Nebraska, where USCIS's Nebraska Service Center is located.

Plaintiff Gara's case will be **TRANSFERRED** to the U.S. District Court for the Southern District of Florida, where the Miami Field Office is located.

Plaintiff Sinibaldi's case will be **TRANSFERRED** to the U.S. District Court for the Middle District of Alabama, where the Montgomery Field Office is located.

The Court will also **GRANT** Defendants' Motion for Extension of Time and allow them to answer or otherwise respond to the Complaint of each Plaintiff within 30 days of the Plaintiff's case being placed on the docket of their respective transferee court.

Separate orders consistent with this Memorandum Opinion will **ISSUE**.

Date: January //, 2022

PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE